Filed 4/10/23  In re K.R. CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SECOND APPELLATE DISTRICT

### DIVISION FOUR

| | |
|---|---|
| In re K.R., a Person Coming Under the Juvenile Court Law. | B318757 |
| | (Los Angeles County Super. Ct. Nos. 19CCJP06661 19CCJP06661A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Petitioner and Respondent, | |
| v. | |
| T.G., | |
| Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Daniel Zeke Zeidler, Judge.  Affirmed in part; reversed and remanded in part with instructions.

Carolyn Hurley, under appointment by the Court of Appeal, for Appellant.

Dawyn R. Harrison, County Counsel, Tracey Dodds, Deputy County Counsel, for Respondent.

## INTRODUCTION

Mother T.G. appeals from the juvenile court's order terminating her parental rights over her daughter, K.R., following a hearing pursuant to Welfare and Institutions Code section 366.26.[1] She argues that the court erred in summarily denying her section 388 petition alleging changed circumstances and seeking six more months of reunification services. She also contends that the court considered improper factors and failed to account for the strong bond she had with the child in terminating her parental rights and determining that the parental benefit exception did not apply. We conclude that the court did not abuse its discretion in finding that mother failed to establish a prima facie case of changed circumstances, and thus affirm the denial of mother's section 388 petition. However, we reverse the order terminating mother's parental rights. We therefore remand the matter with directions to the court to hold a new section 366.26 hearing compliant with the standards set forth in *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*).

In addition, mother contends the juvenile court's finding that the Indian Child Welfare Act (25 U.S.C. § 1901 et seq.) (ICWA) did not apply was erroneous because it was predicated upon a defective ICWA inquiry by the Los Angeles County

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

Department of Children and Family Services (DCFS). We agree. On remand we direct the juvenile court and DCFS to ensure compliance with the requirements of ICWA and related state law.

## BACKGROUND

### I. *Referral and Petition*

Mother and father, S.R., have one child, K.R., who was born in May 2018.[2] K.R. was previously removed from mother in Nevada in 2018. In August 2018, the Nevada Department of Children and Family Services found an allegation of neglect against mother to be substantiated, including a report that mother was having a manic episode and had "trashed the house." Mother stated she had forgotten to take her medication for two days. Father stated he was unable to care for K.R. The child was detained from mother and then released to her once her mental health stabilized. The Nevada social worker reported that mother had begun receiving her medication monthly by injection and that the case was closed in February 2019, with custody of K.R. to mother.

Mother and K.R. moved to California in mid-2019, and the family came to the attention of DCFS after a referral regarding a two-day incident from September 17 to 19, 2019. On September 17, 2019, maternal grandmother (MGM) called the police stating that K.R. was with mother and MGM was concerned for the child's safety. Responding police officers found mother and K.R. around 9:00 p.m. K.R. was running around in the cold outside wearing only a shirt, with no shoes or diaper; when told that the

---

[2] Father is not a party to this appeal. We therefore provide limited information regarding his involvement, only as relevant to this appeal.

3

child needed a diaper and additional clothing, mother stated that she was "fine." Mother ultimately complied and put a diaper and shoes on K.R. The officers reported that mother did not meet the criteria for a psychiatric hold upon questioning. However, when MGM arrived and approached, mother became violent, including grabbing MGM within a few feet of K.R. Police detained mother; MGM took custody of the child. Mother was released several hours later; it appears she did not have contact with her relatives or K.R. until the incident on September 19.

On September 19, 2019, maternal aunt was driving K.R. to see MGM when she saw mother walking up the street. When maternal aunt pulled over, intending to take mother to the hospital, mother grabbed K.R. and continued down the street, crossing back and forth, pulling items off street signs and kissing K.R. Maternal aunt called the police, who reported that mother was incoherent and did not appear to be mentally stable. Mother was placed on an involuntary psychiatric hold.

A DCFS children's social worker (CSW) met with K.R. and MGM on September 19, 2019. MGM reported that mother had been diagnosed with bipolar disorder around 2002, and that mother also had PTSD from being beaten in her sleep by an ex-partner. MGM said that she and maternal aunt called law enforcement after the car incident. MGM said she had no concerns with mother caring for K.R. when mother was mentally healthy. MGM could not care for K.R. because she lived in a senior living facility. DCFS also met with maternal aunt, who echoed that mother was able to care for K.R. and was protective of her when mentally stable.

The CSW met with mother at the hospital on September 20, 2019. Mother claimed she had been held hostage for three

4

days and assaulted by her former boyfriend. She then escaped and was running down the street when maternal aunt saw her. Mother stated that she was diagnosed in 2013 with post-traumatic stress disorder (PTSD), anxiety, and bipolar disorder, and was taking medication. She told the CSW that she smoked one marijuana "blunt" per day and would put K.R. in her crib when going outside to smoke.

MGM denied that mother assaulted her on September 17. She stated that mother had been feeling overwhelmed and reached out to MGM and maternal aunt to help with K.R. MGM also reported that mother was doing well until she ran out of her medication because her psychiatrist kept rescheduling appointments. MGM suggested that mother did not want to increase her medication dosage as her psychiatrist suggested, because mother worried it would make her too drowsy to care for K.R. MGM insisted that mother was a good mother and not violent.

On October 7, the CSW received reports that mother was hospitalized again after another episode. K.R. was not present at the time. Maternal aunt told the CSW she was not sure what was going on with mother, but she and MGM had received erratic voicemails from mother. Maternal aunt found mother at a gas station, standing near her car and playing music loudly. When maternal aunt's daughter approached to speak with mother, mother became aggressive, taking a bat from her vehicle and swinging it. Maternal aunt called law enforcement. Maternal aunt picked up K.R. from a family friend and was caring for the child while mother remained hospitalized.

The CSW spoke with mother at the hospital. Mother denied having an episode and said there was nothing wrong with

her. She also said that maternal aunt and her daughters had tried to "jump" mother, so she got her bat out of her car.

The court signed a removal order on October 9, 2019 and K.R. was removed the next day. When two CSWs arrived at mother's home to serve the removal order, mother stated that K.R. was with maternal aunt and accused the CSWs of "secretly" talking to people about mother. Mother called law enforcement and stated that two CSWs were trying to take her child. Mother refused to let the CSWs into her home, yelled at them, and threatened to fight them. When police arrived, mother informed the officers that K.R. was in her home. The CSWs were then able to leave with K.R.

In the detention report, DCFS noted a prior case from 2006, involving an allegation that mother hit her older child, D., with a belt; the allegation was sustained. Mother was arrested at the time for child cruelty.

DCFS filed a dependency petition on October 15, 2019 under section 300, subdivision (b)(1).[3] In count b-1, the petition alleged that mother had mental and emotional problems, including bipolar disorder, PTSD, and anxiety, that rendered her incapable of regular care for the child. The petition also alleged that mother failed to take her psychotropic medication as

---

[3] Section 300 states, in relevant part, "A child who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge that person to be a dependent child of the court: . . . . [¶] (b)(1) The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent . . . to adequately supervise or protect the child."

6

prescribed and had been involuntarily hospitalized due to her psychiatric condition on September 17, 2019 and multiple prior occasions. Count b-2 alleged that mother abused marijuana daily, which interfered with her care of K.R. and put the child at risk of harm.

In a last-minute information on October 16, 2019, DCFS stated that mother called the day before and accused DCFS of intentionally providing her the wrong information so that she would miss the court date and lose custody of K.R. MGM called a short time later and stated that mother's behavior was becoming more concerning and she felt mother was not mentally stable enough to care for K.R.

A multidisciplinary assessment team report from October 2019 noted that K.R. was observed to have flat affect, limited expressive language, anxiousness, and excessive crying when her caregiver left. She also fell below developmental milestones in communication, fine motor, problem solving, and personal-social skills.

Mother was not present at the October 16, 2019 detention hearing. The court found a prima facie case for jurisdiction over K.R. under section 300. The court ordered K.R. to remain detained from mother and father. The court ordered family reunification services, including monitored visitation for mother and father.

## II. *Jurisdiction/Disposition Report*

DCFS submitted a last-minute information on November 1, 2019, reporting that MGM stated that mother had missed the detention hearing because she was incarcerated and then placed on a psychiatric hospital hold. Mother had since been released,

but the CSW's attempts to contact mother on October 23, 24, 25, and 28 were unsuccessful.

DCFS also outlined its contact with father, who stated he was fearful of mother, as she had previously tried to kill him in his sleep and broke everything in their home, including the bed, dresser, and "the door down to the frame." He reported that when mother was not on her medication she got "really crazy." Father stated that he was not in a position to care for K.R. but wanted to maintain contact through visitation.

DCFS filed a first amended petition on November 18, 2019, adding allegations regarding father's failure to protect to counts b-1 and b-2. The first amended petition also added count b-3, alleging that father had a history of substance abuse and currently abused alcohol and marijuana, and count b-4, alleging that father failed to provide K.R. with the "basic necessities of life."

On November 26, 2019, mother received a temporary restraining order protecting herself and K.R. from maternal aunt. She alleged that on September 19, 2019, maternal aunt "showed up . . . to take my baby," and made "false allegation[s] about my baby." She also alleged that maternal aunt tried to hit mother with her car. The court later denied mother's request for a permanent restraining order.

In its November 2019 jurisdiction/disposition report, DCFS reported that K.R. was currently placed with foster caregiver Ms. N. Ms. N. spoke to DCFS on November 6, 2019, reporting that mother had not visited but was calling at odd hours asking to speak with the child. Mother contacted DCFS on November 12 to set up visits with K.R.

8

A CSW met with mother on November 4, 2019 at a detention facility. Mother was pleasant, cooperative, and coherent. Mother told DCFS that she was first diagnosed with bipolar disorder in 2014. Mother had recently met with a psychiatrist and was taking daily medication. She told the doctor that she did not want to be overmedicated so that she could wake if K.R. needed her. Mother told DCFS that she experienced psychosis but it "comes and goes." Her condition made her "hyper" and the medication helped calm her down. Mother denied any periods when she didn't regularly take her medication. She reported that she had been using marijuana since she was 14, but never smoked in the home.

Mother reported she had not worked since 2014 because of her mental health issues. She met father in 2017, but later broke up with him because of his excessive alcohol use. Mother admitted having a prior dependency case in Nevada but denied any wrongdoing. She said father reported her because he was upset with her and that the Nevada social workers detained K.R. because of mother's mental health issues, but later returned her. Mother claimed that DCFS was making the same mistake and that she was in trouble just for being mentally ill. She also denied ever hitting her adult son, D. Mother agreed to participate in all services to reunite with K.R.

Father told DCFS that mother had been hospitalized "so many times." He stated that sometimes mother did not take her medication so that she could drink, and that when she did not medicate she was "angry." He stated that mother loved K.R. but when she was having a mental health episode, she would forget how to care for herself or the child and would become violent.

9

Mother's treatment records showed that she was admitted to a medical facility on September 19 and discharged September 30, 2019. At the time of admission, the hospital reported that mother could not recall the last time she ate or drank, appeared confused and "gravely disabled." Mother remained confused and disorganized for the first part of her hospitalization, but with a longer stay and further interventions, she was able to stabilize. She and her case manager agreed on a discharge plan to return mother to the family home and resume outpatient treatment.

On November 13, 2019, mother's psychiatrist reported that mother's primary diagnosis was Bipolar I Disorder. She recommended seeing mother monthly until she was stabilized. The psychiatrist stated that when mother was medication compliant, she was coherent and appeared well. The psychiatrist also advised mother to stop using marijuana as it could affect her mental health.

In a last-minute information on December 5, 2019, DCFS reported that it had assessed Ms. M., a non-related extended family member (NREFM), for possible placement. Maternal aunt told DCFS that due to a conflict within the family, they preferred K.R. be placed with a NREFM instead of maternal aunt.

Mother tested negative on toxicology tests on November 12 and 27, 2019. Mother also submitted a letter dated December 12, 2019, confirming that she had been receiving outpatient mental health treatment at Harbor-UCLA Psychiatry since August 2019, with her most recent appointment on December 4. Mother was prescribed daily medication and her providers were working on referring her to individual therapy.

III.   *Adjudication and disposition*

The court held the adjudication hearing on December 12, 2019. Mother was present; father was not. The court amended the petition by changing the allegation in count b-2 regarding mother's substance abuse from current daily abuse to a history of abuse. The court then sustained the petition as amended for counts b-1 and b-2 as to both parents, and b-3 as to father; the court struck count b-4 regarding father. The court found jurisdiction over K.R. under section 300, subdivision (b), and found by clear and convincing evidence that removing the child from her parents was reasonable and necessary. The court ordered K.R. placed with NREFM Ms. M, ordered mother to participate in regular psychiatric care, individual counseling, and weekly on-demand drug and alcohol testing, and ordered mother to take all prescribed psychotropic medications. The court further ordered monitored visitation for mother, with DCFS discretion to liberalize or walk on a request for a home-of-parent order.

Mother appealed the December 2019 jurisdictional and dispositional orders. Mother's appointed counsel filed a brief stating that there were no arguable issues, and the appeal was dismissed pursuant to *In re Phoenix H.* (2009) 47 Cal.4th 835, 838.

IV. *Period of Review*

In a status review report on June 8, 2020, DCFS reported that K.R. had been moved from two foster homes, but was placed with NREFM Ms. M. on December 17, 2019, where she was doing well. During this period of supervision, mother had maintained employment, consistently and respectfully communicated with DCFS, was attentive during visitation with K.R., and had kept up her mental health treatment. Father had chosen not to

participate in reunification. K.R. was meeting developmental milestones and presented to the CSW as a "happy, curious child."

Mother tested negative for drugs and alcohol eleven times between November 2019 and May 2020, and positive three times for marijuana, with one no-show. With regard to the positive tests, mother denied using any substances, but stated she had been in some situations with people smoking marijuana in abundance. In light of the low levels detected and the other negative tests, DCFS concluded that mother "does not have a substance abuse issue at this time."

Mother's psychiatrist reported that mother had been responsible in keeping her appointments, was taking her medication, and the psychiatrist had no safety concerns with mother being around K.R. or her capability to care for the child. Mother had been attending individual therapy since January 2020 and her therapist reported that she was compliant with appointments and treatment goals. K.R.'s caregivers provided positive reports regarding mother's monitored visits with K.R., and mother was able to progress to unmonitored overnight weekend visits, which were going well. Mother was appropriate and protective of K.R., and communicated respectfully with the NREFM. The CSW observed a strong bond between mother and K.R. and reported that mother was attentive and appropriate in her care. DCFS found the risk of harm to K.R. to be moderate, and recommended that K.R. return home to mother.

The six-month review hearing was continued due to the COVID-19 pandemic. In July 2020, the parties stipulated to waive their appearances at the hearing and agreed to a home-of-mother order, with family maintenance services for mother.

12

In its status review report on January 21, 2021, DCFS reported that K.R. remained placed with mother. Mother and child were doing well and mother had maintained communication with DCFS and made K.R. available for visits. Mother also continued to maintain her mental health treatment plan. In random testing between July and December 2020, mother tested positive for marijuana nine times, with one negative test and two no shows. Mother stated that she did not smoke marijuana daily, but had smoked on occasion during this period of quarantining due to the pandemic, but only smoked when K.R. was asleep or supervised by MGM. The CSW opined that mother did not have a substance abuse issue at this time, noting the generally low and recently decreasing levels in her system.

DCFS also included a progress letter from mother's psychiatrist dated January 6, 2021, reporting that mother had begun treatment in August 2019 and was consistent with her appointments and her prescribed medication. In June 2020, mother's therapist told DCFS that mother had been "compliant with appointments and treatment goals" since she began therapy in January 2020. After that therapist passed away, mother found a new therapist and began weekly sessions in December 2020. Mother was also actively participating in a family preservation program.

During monthly visits with mother and K.R., the CSW observed mother to be attentive, patient, and strongly bonded to K.R. DCFS concluded that the risk of harm to K.R. was low and recommended the court terminate jurisdiction with sole physical custody to mother.

The court held a section 364 review hearing on February 5, 2021, and continued the matter for an update on mother's marijuana use.

## V.    *Supplemental and Subsequent Petitions*

On February 17, 2021, DCFS filed a section 387 supplemental petition and a section 342 subsequent petition. In the supplemental petition, DCFS alleged in count s-1 that mother failed to comply with the court's orders by failing to take her prescribed psychotropic medication. On February 12, mother "demonstrated agitated and erratic behaviors including hallucinating" while K.R. was in her care; mother was hospitalized the same day. In the subsequent petition, DCFS alleged in count b-1 that on February 12, mother placed K.R. in a detrimental and endangering situation by letting her "run around a parking lot resulting in vehicles stopping" to avoid striking the child.

In its detention report, DCFS stated that it had received a hotline call on February 11 from MGM, reporting that mother was pregnant, and because of the pregnancy, mother's psychiatrist recommended that mother only take half of her medication. MGM stated that mother was hallucinating and she was concerned that mother was unstable and manic after failing to take her medication. MGM also reported that mother was not sleeping and had been calling family members, crying, in the middle of the night.

The following day, February 12, sheriff's deputies responded to a call at a Home Depot store. The caller reported that mother was letting K.R. run around the parking lot, with cars having to stop to avoid hitting the child. Mother and K.R. also went into the store, where mother was making "random and

14

odd statements," and was crying at times. The responding CSW noted that K.R. was not appropriately dressed for cold weather, with no shirt, socks, or shoes. Mother was taken to the hospital on a psychiatric hold. K.R. was replaced with her former caregiver, NREFM Ms. M.

At the detention hearing on February 22, 2021, the court found a prima facie case that the prior case plan was not successful in protecting K.R. The court removed K.R. from mother and ordered monitored visitation. MGM told the court that as these issues with mother continued, she was concerned for K.R.'s safety, and that the family preferred if mother could not reunite with K.R., that the child be adopted by NREFM Ms. M.

In advance of the next hearing, mother submitted a letter from her psychiatrist dated March 5, 2021. He reported that mother stated she was pregnant in February and was therefore advised to discontinue one of her medications and to lower the dosage on a second medication. A few weeks later, mother had a manic episode and was hospitalized. Subsequent testing revealed that mother was not pregnant. Therefore, she again began taking three medications. The psychiatrist noted that "[c]urrently, [mother] seems to be linear and appropriate."

In its jurisdiction/disposition report, DCFS detailed a conversation with mother in the hospital on February 24. Mother stated that she had been pregnant and her psychiatrist told her to stop taking her psychotropic medication because of the pregnancy. Mother stated she then had a miscarriage. Regarding the incident on February 12, she stated that she was shopping in Home Depot when K.R. had a toileting accident. She did not have any diapers, so she asked people at the store for

15

some. An employee then called 911. Mother claimed that she explained to the responding officers that everything was fine and they took her and K.R. home. The next day, she took K.R. to the hospital for a COVID test, but mother was then hospitalized. Mother claimed that nothing was wrong with her. In another interview on March 11, mother again denied her recent mental health crisis and stated that DCFS had kidnapped her child.

Mother's therapist reported to DCFS that mother had missed two appointments in February 2021. DCFS also spoke with NREFM Ms. M, who explained that she and her mother were friends with MGM, and that she had watched K.R. at times after the child was returned to mother in 2020. When asked if she had any concerns, Ms. M stated that sometimes mother would drop off K.R. "with nothing for her," and that mother sent her "weird text messages out of the blue" a few times. Ms. M. stated that since mother was released from the hospital, she had been having Facetime calls with K.R. every other day. According to Ms. M., K.R. was "a mess" when she arrived, with matted hair, no shoes, and no shirt. K.R. had been having night terrors and would scream and cry throughout the night, but the episodes had become less frequent. Ms. M. expressed a desire to adopt K.R. and stated that she did not think mother could provide stability for K.R.

DCFS recommended no further family reunification services for mother, noting that the prior services had not alleviated the problems that led to jurisdiction. In a last-minute information on April 1, 2021, DCFS detailed an interview with mother's psychiatrist on March 18, 2021. The psychiatrist stated that he was not aware of any marijuana use by mother, but that his general recommendation is to avoid or minimize the use of

cannabis while taking psychotropic medication, as certain combinations could cause negative interactions.

DCFS also spoke to father, who stated that he had cared for K.R. in Las Vegas shortly after she was born, when mother had been hospitalized on a psychiatric hold. Father reported that at the time, mother was abusive to the child, including holding K.R. "upside down by her ankles," and locking the baby in a room while she was crying. Father stated that mother had promised him that her "episodes" would not happen again, but he felt that mother could not safely care for K.R. Father acknowledged that he was currently unable to care for K.R.

In a letter on April 14, 2021, mother's psychiatrist reported that mother had started receiving one of her psychotropic medications by injection while she was hospitalized in February 2021. Mother had received her monthly injection on March 25 and was scheduled for the next dose in late April.

The court held the adjudication hearing on April 15, 2021. Mother asked the court to dismiss both petitions, arguing that the allegations that she let K.R. run around a parking lot were false and that any erratic behavior was an "isolated incident" due to her discontinuing medications on the advice of her psychiatrist. She contended that she resumed her medications once she found out she was no longer pregnant, was working closely with her psychiatrist, and had stabilized. Counsel for K.R. asked the court to sustain the petitions, pointing out that mother was not advised to stop her medication entirely and that the record did not support mother's claim that she resumed her medication as soon as she found out she was not pregnant. Counsel for DCFS agreed, also pointing out mother's history of a

17

period of compliance and stability followed by stopping her medications and putting K.R. at serious risk of harm.

The court sustained count s-1 of the section 387 petition and count b-1 of the section 342 petition, and found it necessary to remove K.R. from mother. Noting that "we're on the third or fourth go-around of the mother's psychiatric issues impacting her ability to parent, as well as some levels of denial regarding her psychiatric issues and the extent of them," the court denied mother's request for six additional months of reunification services. The court terminated reunification services for both parents, ordering monitored visitation for mother. The court set a section 366.26 permanency planning hearing for August 10, 2021.

DCFS filed an interim review report on June 11, 2021. K.R. remained placed with Ms. M. and appeared to have developed a strong bond with her caregiver. Ms. M. remained committed to adopting K.R.

## VI. *Termination*

DCFS filed a supplemental section 366.26 report on July 6, 2021, reporting that adoption planning with Ms. M. was proceeding. DCFS recommended termination of parental rights. DCFS filed a full section 366.26 report on July 20, 2021. K.R. was meeting all developmental milestones and her daycare reported that she was "adaptive, happy, and great socially." Ms. M. stated that K.R. was sleeping and eating normally and was a curious and playful child.

The report also included a single, three-line paragraph regarding mother's contact with K.R., stating that mother was present for all scheduled visitation with K.R. and was active in communicating with the child. The CSW observed a strong bond

18

between mother and child and stated that K.R. was "easily redirected by mother's verbal commands and comforted by mother's presence."

Mother filed a section 388 petition (form JV-180) on August 3, 2021. She requested that the court order the resumption of reunification services for six months. She stated that since the termination of reunification services in April, she had remained stable and on her medication, was consistently visiting with her therapist and doctors, and "with the help of her medication she remains calm, linear and appropriate in affect." Mother also stated that she had tested clean for all substances. She argued that the request would be in K.R.'s best interest because they had substantial contact and a strong bond, and K.R. was comforted by mother.

Along with the petition, mother included a letter dated July 9, 2021 from her psychiatrist, stating that mother had been keeping her scheduled appointments since March. The psychiatrist also stated that during her appointments, mother seemed "calm, linear in thought process, and appropriate in affect." Mother continued to receive monthly injections of one medication and, to the psychiatrist's understanding, had been taking the other two medications as directed. The letter also reported that there had been no known recent exacerbations in mother's symptoms and that she reported her mood as stable. Mother also included a letter dated August 2, 2021, confirming that she had been consistently attending weekly individual therapy sessions since April 2021. The therapist stated that mother had been engaged in her sessions and in completing assignments, and had "consistently demonstrated a commitment

19

to care for her child."  Mother also attached a negative substance test from July 19, 2021.

The court held a hearing regarding permanency planning on August 10, 2021. The court first addressed mother's section 388 petition, stating that it had denied the petition without a hearing.  The court found that the petition had not established a sufficient change of circumstance or that the request was in K.R.'s best interests.  Specifically, the court found that mother's petition showed "changing, not changed, circumstances," noting that mother's "first sessions and the attachments were from June and July."  In addition, the court stated that there was "no legal basis to reinstate reunification family services beyond the 18-month date with a .26 hearing pending."

Turning to permanency planning, the court noted that it had reviewed the 366.26 report, including the "very brief" section on contact with mother, in which DCFS observed that mother and K.R. had a strong bond.  Counsel for mother argued that the court should apply the parental benefit exception and not terminate her parental rights.  She pointed to the bond between mother and K.R. and mother's active participation in visitation with the child.  She also noted that K.R. was living with mother until February 2021 and clearly still responded to mother as a parent.  K.R.'s counsel also requested that the court not terminate mother's parental rights, arguing that mother had a parental role in K.R.'s life at least until her removal in February, and that since that point, mother had remained actively engaged in K.R.'s life.  She also noted that mother had been complying with her mental health requirements since February, and that the benefits of adoption did not outweigh the continued relationship with mother.

Counsel for DCFS argued that the court should terminate the rights of both parents. He acknowledged the "close bond" between mother and K.R., but noted mother's extensive history of "severe mental health interfering with her ability to parent" K.R., as well as the history with mother's adult child. He contended that mother had not shown she was able to comply with her medication and other mental health interventions for more than a few months at a time.

The court found that continued jurisdiction was necessary and that K.R. was adoptable. The court found that mother had maintained "regular and consistent visitation and contact, which has conferred a parental role and relationship" with K.R. However, the court noted that K.R. had only been in mother's care for eight of the past 22 months, and her current caretaker, Ms. M., "has been the primary parent raising this child and forming that bond for this child . . ., plus there have been issues around the mother's mental state while the child has been in mother's custody, in terms of the exposure of the child to that."

The court concluded that the "benefits of adoption outweighed the benefits of maintaining the parent/child relationship, and that it would not be detrimental to the child to sever the parent/child relationship." The court therefore found that no exceptions to adoption applied and adoption was in the best interests of K.R. Accordingly, the court terminated mother's and father's parental rights and set adoption as the permanent plan.

Mother timely appealed from the court's August 10, 2021 orders.[4]

## VII. *ICWA Proceedings*

In the initial petition filed in October 2019, DCFS completed the Indian Child Inquiry Attachment (CWA-010(A)), checking the box indicating that K.R. "may have Indian ancestry." Mother told DCFS at the time that K.R. had "Blackfoot" ancestry. In the detention report, DCFS explained

---

[4] In subsequent proceedings included in the record on appeal, DCFS reported that K.R. was removed from Ms. M.'s home at the caregiver's request. Ms. M. told DCFS that she was overwhelmed, mentally unstable, and unable to care for K.R. Ms. M. also stated that she was concerned K.R. would dislike her if Ms. M. did not allow her to see mother as much as K.R. wished. K.R. was placed in a new foster home with Ms. J. on December 9, 2021. Ms. J. reported that mother participated in weekly telephone calls with K.R. and visited twice; during the visits mother was appropriate and K.R. enjoyed being around her. K.R. was reportedly doing well in her foster home, but DCFS continued to look for a permanent placement for her.

Mother filed a second section 388 petition on February 7, 2022. She asked the court to reinstate her parental rights, stating that she continued to take her monthly psychotropic injection, was attending therapy, and had stabilized. She attached a January 2022 letter from her psychiatrist, confirming that she had been keeping her appointments since March 2021 and was taking her medications as prescribed. She also attached a January 2022 letter from her therapist, stating that she had been attending therapy sessions consistently since April 2021, and that she engaged in the sessions and practiced the skills discussed. The record does not contain a ruling on this petition and mother has not raised it as a basis for error on appeal.

that mother had reported that K.R. had "Blackfoot Indian heritage" but denied being enrolled in a tribe.

At the detention hearing in October 2019, the court asked MGM (who was present at the hearing) about mother's statement that the family had "Blackfoot" ancestry. MGM responded, "I don't know anything about that. It could be." MGM denied that anyone had ever told her that she or K.R. had any Indian ancestry. The court ordered DCFS to investigate mother's claim and to send ICWA notice to the Blackfeet tribe.[5]

DCFS provided updated information regarding ICWA in a last-minute information on November 1, 2019. Father denied any Native American heritage and stated that he was born in Jamaica. DCFS reported that MGM had provided additional information for maternal relatives, including that while she was not aware of any Native American ancestry on her side, there had been "talk" that there might be. The following day, maternal grandfather provided additional information for maternal relatives, including his parents' names. He stated that he was not enrolled in a tribe, but that there might be Cherokee or Creek tribe ancestry in his family. He could not recall anything further. DCFS sent notices on October 31, 2019 to the Blackfeet, Cherokee, and Creek tribes.

---

[5] "We observe that there is frequently confusion between the Blackfeet tribe, which is federally recognized, and the related Blackfoot tribe which is found in Canada and thus not entitled to notice of dependency proceedings. When Blackfoot heritage is claimed, part of [DCFS's] duty of inquiry is to clarify whether the parent is actually claiming Blackfoot or Blackfeet heritage so that it can discharge its additional duty to notice the relevant tribes." (*In re L.S.* (2014) 230 Cal.App.4th 1183, 1198.)

At a hearing on November 1, 2019, MGM, two maternal aunts, and a maternal cousin were present. The court noted that mother had indicated possible Blackfeet ancestry. Moreover, in light of maternal grandfather's statement regarding possible ancestry, the court ordered ICWA notice to all Blackfeet, Cherokee, and Creek tribes.

DCFS provided the court with copies of the notices sent on October 31, 2019 to numerous tribes, as well as to the Bureau of Indian Affairs. The notices listed the name, date of birth, and place of birth for K.R., mother and father, the same information as well as current addresses for MGM and maternal grandfather, names and partial information regarding date and place of birth for all four maternal great-grandmothers and great-grandfathers, and the names of paternal grandmother and grandfather.

DCFS provided a last-minute information on December 5, 2019 summarizing the ICWA notices sent and responses received. DCFS received response letters from multiple tribes indicating that K.R. was not eligible for membership or that she was not an Indian child according to the tribe. DCFS also noted a few responses stating that the investigation was pending and a few tribes that had not yet responded.

At the December 12, 2019 adjudication hearing, the court reviewed the responses received to the ICWA notices, noting that several responses still were outstanding. The court found that ICWA notice was proper and complete and it did not have a reason to know that K.R. was an Indian child under ICWA. The court then noted that "for any .26 hearing we would need responses from those tribes that are still pending."

All subsequent reports cited the court's December 2019 finding that ICWA did not apply. DCFS subsequently provided a

December 19, 2019 letter from the Blackfeet tribe, stating K.R. was not eligible for enrollment. There is no information in the record of any further follow up regarding outstanding notices.

## DISCUSSION

### I. *Denial of Section 388 Petition*

Mother contends that the juvenile court erred in summarily denying her section 388 petition seeking additional reunification services. She argues that she made a prima facie showing of changed circumstances based on her commitment to her mental health treatment, therapy, and testing clean from all substances. She also argues that continued reunification services were in the best interest of K.R., given their strong bond. She contends that the court found otherwise based on a misunderstanding that it had no ability to extend services once the section 366.26 hearing had been set. We conclude that the court did not abuse its discretion in finding that mother had not made a prima facie showing of changed circumstances. Thus, the court did not err in denying mother's petition without a hearing.

#### A. *Legal Principles*

Pursuant to section 388, a parent may petition the juvenile court for modification of any previous order based upon changed circumstances or new evidence. (*In re Alayah J.* (2017) 9 Cal.App.5th 469, 478.) A parent may seek relief under section 388 even after the juvenile court has terminated family reunification services. "After reunification services have been terminated, it is presumed that continued out-of-home care is in the child's best interests. [Citation.] Section 388 allows a parent to rebut that presumption by demonstrating changed circumstances that would warrant modification of a prior court order." (*Ibid*.)

To obtain modification of an order under section 388, the parent must demonstrate, by a preponderance of the evidence, both a change of circumstances or new evidence, and that the proposed change is in the best interests of the child. (*In re Alayah J., supra*, 9 Cal.App.5th at p. 478; *In re Mickel O.* (2011) 197 Cal.App.4th 586, 615.) In evaluating a section 388 petition, the juvenile court may consider factors such as "the seriousness of the reason leading to the child's removal, the reason the problem was not resolved, the passage of time since the child's removal, the relative strength of the bonds with the child, the nature of the change of circumstance, and the reason the change was not made sooner." (*In re Mickel O., supra*, 197 Cal.App.4th at p. 616; see also *In re Kimberly F.* (1997) 56 Cal.App.4th 519, 530-532.) The analysis is a searching one; the court may consider the entire factual and procedural history of the case. (*In re Mickel O., supra*, 197 Cal.App.4th at p. 616.) "In assessing the best interests of the child, 'a primary consideration . . . is the goal of assuring stability and continuity.'" (*Ibid*.)

"To support a section 388 petition, the change in circumstances must be substantial." (*In re Ernesto R.* (2014) 230 Cal.App.4th 219, 223.) Moreover, "[o]nce reunification services are ordered terminated, the focus shifts [from reunification] to the child's need for permanency and stability," and a presumption arises that "continued care [under the dependency system] is in the best interest of the child." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309–310.) After reunification services are terminated, inquiry into a child's best interests includes consideration of his or her need for permanency and stability. (*In re J.C.* (2014) 226 Cal.App.4th 503, 526–527.)

26

On receipt of a section 388 petition, the court may either summarily deny the petition or order a hearing. (*In re Lesly G.* (2008)162 Cal.App.4th 904, 912.) Section 388 petitions "are to be liberally construed in favor of granting a hearing to consider the parent's request." (*In re Marilyn H., supra*, 5 Cal.4th at p. 309; see also Cal. Rules of Court, rule 5.570(a).) In order to proceed to a hearing, the petitioner must make a prima facie showing in his or her favor. (Cal. Rules of Court, rule 5.570(a); see also *In re Marilyn H., supra*, 5 Cal.4th at p. 310.) "'There are two parts to the prima facie showing: The parent must demonstrate (1) [either] a genuine change of circumstances or new evidence, and . . . (2) [that] revoking the previous order would be in the best interests of the [child].'" (*In re C.J.W.* (2007) 157 Cal.App.4th 1075, 1079; see also *In re Kimberly F., supra*, 56 Cal.App.4th at p. 529; Rules of Court, rule 5.570(d)(1) & (2).) "'If the liberally construed allegations of the petition do not show changed circumstances such that the child's best interests will be promoted by the proposed change of order, the dependency court need not order a hearing.'" (*In re C.J.W., supra*, at p. 1079; see also *In re Edward H.* (1996) 43 Cal.App.4th 584, 592 ["A 'prima facie' showing refers to those facts which will sustain a favorable decision if the evidence submitted in support of the allegations by the petitioner is credited."].)

We review the juvenile court's summary denial of a section 388 petition for abuse of discretion. (*In re C.J.W., supra*, 157 Cal.App.4th at p. 1079.) However, to the extent the denial is based on a mistake of law, our review is de novo. (See *In re Malick T.* (2022) 73 Cal.App.5th 1109, 1123 (*Malick T.*); *In re M.F.* (2019) 32 Cal.App.5th 1, 18.)

**B.** *Analysis*

27

The juvenile court found that mother failed to meet her initial burden to show both a genuine change of circumstances and that it would be in the child's best interests to reinstate reunification services. As such, the court concluded mother was not entitled to an evidentiary hearing on her section 388 petition. We conclude this was not an abuse of discretion.

Mother contends that she adequately alleged a change in circumstances based on the evidence that she had been keeping her appointments with her psychiatrist, was taking her prescribed medication, regularly attended therapy, and tested clean for substances, and as a result had remained mentally stable. The court found that this evidence demonstrated *changing*, rather than changed, circumstances. The court noted that mother's letters from her psychiatrist and therapist were written in June and July, just one to two months prior to her petition in August 2021. Mother's letter from her psychiatrist, dated in July, stated that she had been consistent with her treatment since March, including monthly injections of one medication, that there had been no known recent exacerbations in mother's symptoms, and that she reported her mood as stable. Similarly, the letter from mother's therapist confirmed that she had been attending weekly sessions since April. Mother also provided a single clean drug test from July 2021. Thus, at most, mother's evidence demonstrated five months of consistency with her mental health treatment. On the other hand, the court was entitled to consider mother's history, including multiple instances where mother had periods of stability that ended when she stopped taking her medication and keeping her appointments, resulting in involuntary hospitalization and other unstable behavior that put K.R. at serious risk of harm. As such, it was

28

not an abuse of discretion for the court to find that mother's evidence did not establish a long enough period of stability to demonstrate a genuine change of circumstances. "A petition which alleges merely changing circumstances and would mean delaying the selection of a permanent home for a child to see if a parent, who has repeatedly failed to reunify with the child, might be able to reunify at some future point, does not promote stability for the child or the child's best interests." (*In re Edward H., supra*, 43 Cal.App.4th 584, 594.)

Mother's primary contention on appeal is that the court's conclusion that the petition was not in K.R.'s best interest was premised on a legal error. The juvenile court determined that it had no legal basis to order additional reunification services, short of immediately returning the child to mother, once mother had received 18 months of services and the court had set a permanency planning hearing under section 366.26. Based on that understanding, the court concluded that mother's request would not be in K.R.'s best interest.

We need not reach this argument. In order to prevail on her section 388 petition, mother must show both changed circumstances *and* that the requested change is in the child's best interest. (*In re C.J.W., supra,* 157 Cal.App.4th at p. 1079; *In re Kimberly F., supra*, 56 Cal.App.4th at p. 529.). Here, the court found that mother did not establish a prima facie case of changed circumstances. That finding, alone, was sufficient to deny her section 388 petition.

Mother relies on *Malick T., supra,* 73 Cal.App.5th 1109, in support of her argument that the court made a legal error that

29

infected its best interest analysis.[6]  But in *Malick T.*, the juvenile court found that the petitioning mother had established changed circumstances.  (*Id*. at p. 1121.)  To the contrary, here, the court found that mother had not made her prima facie showing of changed circumstances.  We therefore find no error in the juvenile court's denial of mother's petition without a hearing.

## II.    *Termination of Parental Rights*

Mother contends the juvenile court erred in terminating her parental rights because she established the beneficial parental relationship exception.  Specifically, she asserts that it was undisputed that she regularly visited K.R., had a parental relationship with her daughter, and that she and K.R. were strongly bonded.  Accordingly, she contends that the court erred in finding that the benefits of adoption outweighed the detriment to K.R. from severing her relationship with mother.  We agree, and remand so that the court may consider the parental benefit exception with the guidance of the standards set forth in *Caden C.*

### A.    *Legal Standards*

Section 366.26's express purpose is "to provide stable, permanent homes" for dependent children.  (§ 366.26, subd. (b).)  If the juvenile court ends reunification services, adoption is the legislative preference.  (§ 366.26, subd. (b)(1); see also *In re Celine R.* (2003) 31 Cal.4th 45, 53 ["'Adoption is the Legislature's first choice because it gives the child the best chance at [a full] emotional commitment from a responsible caretaker.'"].)  Thus, once the juvenile court finds the child is adoptable, "the court

---

[6]    We note that, despite mother's primary reliance on *Malick T.*, DCFS did not cite or discuss the case in its respondent's brief.

30

must order adoption and its necessary consequence, termination of parental rights," unless a parent can demonstrate one of the exceptions set forth in section 366.26 applies. (*In re Celine R., supra*, 31 Cal.4th at p. 53; see also § 366.26, subd. (c)(1); *Caden C., supra,* 11 Cal.5th at p. 625.) The specified circumstances in section 366.26, subdivision (c)(1)(B) are "actually, exceptions to the general rule that the court must choose adoption where possible." (*In re Celine R., supra*, 31 Cal.4th at p. 53.) They "merely permit the court, in exceptional circumstances [citation], to choose an option other than the norm, which remains adoption." (*Ibid.*; see also *In re A.L.* (2022) 73 Cal.App.5th 1131, 1150.)

The parental benefit exception permits the selection of another permanent plan where a parent has "maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) In *Caden C.*, published just a few months before the court's decision in this case, our Supreme Court offered a detailed analysis of the requirements for the parental benefit exception. First, the parent asserting the exception must show "regular visitation and contact with the child, taking into account the extent of visitation permitted." (*Caden C., supra*, 11 Cal.5th at p. 636.) This element is "straightforward," involving an assessment of whether the parent visits consistently. (*Id.* at p. 632.)

Second, the parent must show that "the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship." (*Caden C., supra*, 11 Cal.5th at p. 636.) In assessing whether the child would benefit from continuing the relationship with the parent, "the focus is the

child. And the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.'" (*Id*. at p. 632.) Thus, "courts often consider how children feel about, interact with, look to, or talk about their parents." (*Ibid*.)

For the third element, the parent must show that terminating the parent-child attachment "would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*Caden C., supra*, 11 Cal.5th at p. 636.) "Because terminating parental rights eliminates any legal basis for the parent or child to maintain the relationship, courts must assume that terminating parental rights terminates the relationship. [Citations.] What courts need to determine therefore, is how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Id*. at p. 633.) This evaluation consists of a "subtle, case-specific inquiry[,]" including consideration of whether "the benefit of placement in a new, adoptive home" outweighs the harm the child "would experience from the loss of [a] significant, positive, emotional relationship" with the parent. (*Ibid*.) In making this detriment determination, the juvenile court does "not look to whether the parent can provide a home for the child," and "is not comparing the parent's attributes as custodial caregiver relative to those of any potential adoptive parent(s)." (*Id*. at p. 634.)

*Caden C., supra*, 11 Cal.5th 614, also clarified the standard of review applicable to a juvenile court's findings regarding the parental-benefit exception. The first two elements—regular

visitation and a beneficial relationship—involve determinations that are essentially factual; we therefore review those findings for substantial evidence. (*Id*. at p. 640.) The third element requires the juvenile court to determine whether any harm the child would suffer from the severance of the parental bond would outweigh the benefit to the child of adoption. (*Ibid*.) This requires a "hybrid" standard of review. (*Id*. at pp. 640-641.) Like the first two elements, the juvenile court must make a series of factual determinations including determinations about the child's relationship with a parent, which we review for substantial evidence. (*Id*. at p. 640.) However, "the ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with his [or her] parent—is discretionary and properly reviewed for abuse of discretion." (*Ibid*.)

> **B.** *Analysis*

Mother points to the court's recognition here that she had a strong bond with K.R., as well as DCFS's acknowledgment that mother's visits were appropriate and consistent, that K.R. responded to mother's direction, and that the child was comforted by mother's presence. Indeed, K.R.'s counsel agreed and asked the court not to terminate her parental rights given the extent of their bond. As such, she contends that she established the first two elements of regular visitation and a beneficial relationship. DCFS does not dispute this point, and we agree that substantial evidence supports the juvenile court's finding in mother's favor as to the first and second elements of the exception.

Mother argues that under *Caden C*., the court erred in finding that she failed to meet the third element, i.e., that termination of her parental rights would be detrimental to K.R.

First, she notes that DCFS provided very few details of her visits with K.R. to the court, which meant the court could not fully perform the necessary "subtle, case-specific inquiry" required under *Caden C.*, including assessment of their bond or the potential detriment from terminating their relationship. (See *Caden C., supra*, 11 Cal.5th at p. 633.) While it was mother's burden, not DCFS's, to establish the beneficial relationship exception, "in evaluating the record, we cannot overlook the fact the agency provided very little information in its [ ] reports during the case about the quality of mother's relationship with [K.R.] or even the nature of her interactions with [her] during visitation. . . . [DCFS's reports] should already have provided objective, disinterested information about the quality of [K.R.'s] attachment to [her] mother, which would have assisted the court in evaluating the beneficial relationship exception when mother asserted it." (*In re J.D.* (2021) 69 Cal.App.5th 594, 860-861; see also *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575-576; *In re Brandon C.* (1999) 71 Cal.App.4th 1530, 1538.)

Further, mother argues that the court improperly relied on her mental health issues at the section 366.26 hearing, without analyzing whether those issues affected her relationship with K.R. As the Court noted in *Caden C.*, "making a parent's continued struggles with the issues leading to dependency, standing alone, a bar to the exception would effectively write the exception out of the statute"; on the other hand, a parent's struggles may be relevant where those struggles "mean that interaction between parent and child at least sometimes has a '"negative" effect' on the child." (*Id.* at p. 637.) Lastly, mother argues that the court improperly focused on K.R.'s relationship with her caregiver, Ms. M., as compared to the bond the child

34

shared with mother. (See *id*. at p. 634 ["When it weighs whether termination would be detrimental, the court is not comparing the parent's attributes as custodial caregiver relative to those of any potential adoptive parent(s)."].)

In three sentences, DCFS contends that the court did not abuse its discretion. It points out that K.R. was 16 months old when first removed from mother in 2019, and had lived with mother for eight months of the past 22 at the time of the section 366.26 hearing. DCFS thus concludes that the court's finding was not "arbitrary nor capricious." DCFS therefore failed to meaningfully address mother's arguments regarding *Caden C*. or offer substantive opposition to mother's contentions.

From the record before us, we cannot determine whether the juvenile court conducted a full analysis of the applicability of the parental relationship exception as articulated in *Caden C*. In addition, the court's assessment at the time was based, at least in part, on K.R.'s relationship with Ms. M, with whom she is no longer living. Under these circumstances, we find it prudent to remand the matter for a new section 366.26 hearing that conforms to the requirements detailed by the Court in *Caden C*. (See, e.g., *In re J.D., supra*, 70 Cal.App.5th at p. 854 ["'[W]e conclude that the juvenile court's ruling cannot be affirmed on this record, because we cannot be certain the juvenile court did not consider factors disapproved of in *Caden C.*'"]; *In re D.P.* (2022) 76 Cal.App.5th 153, 170; *In re D.M.* (2021) 71 Cal.App.5th 261, 271.). We therefore reverse the order terminating mother's parental rights and remand for further proceedings consistent with this opinion.

## III.   *ICWA Inquiry*

Mother argues that the court's finding that ICWA did not apply is invalid due to DCFS's failure to discharge its duty of inquiry into K.R.'s possible Native American heritage. DCFS responds that any inquiry error was harmless, as DCFS followed up with notices to all potentially applicable tribes. In light of the remand of this case, we need not reach the issue of harmlessness. We direct the court and DCFS to correct any inquiry or notice errors upon remand.

"In any given case, ICWA applies or not depending on whether the child who is the subject of the custody proceeding is an 'Indian child.'" (*In re Abbigail A.* (2016) 1 Cal.5th 83, 90.) Both ICWA and state statutory law define an "Indian child" as a child who is either a member of an Indian tribe or is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe. (25 U.S.C. § 1903(4); accord, § 224.1, subds. (a)-(b).)

Pursuant to ICWA, the juvenile court and DCFS have "an affirmative and continuing duty to inquire whether a child for whom a petition under Section 300 . . . may be or has been filed, is or may be an Indian child." (§ 224.2, subd. (a); see *In re Isaiah W.* (2016) 1 Cal.5th 1, 9, 11-12.) ""The court must also 'instruct the parties to inform the court if they subsequently receive information that provides reason to know the child is an Indian child.'"" (*In re Y.W.* (2021) 70 Cal.App.5th 542, 551; see 25 C.F.R. § 23.107(a) (2021).)

When a child is placed in the temporary custody of a county welfare department, the initial duty to inquire "includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect,

36

whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled." (§ 224.2, subd. (b).) If this initial inquiry creates a "reason to believe" a child is an Indian child, DCFS is required to "make further inquiry regarding the possible Indian status of the child, and shall make that inquiry as soon as practicable." (§ 224.2, subd. (e); *In re D.S.* (2020) 46 Cal.App.5th 1041, 1052.) If the further inquiry gives DCFS a "'reason to know'" the child is an Indian child, then the formal notice requirements set forth in section 224.3 apply. (§§ 224.2, subd. (d), 224.3, subd. (a); *In re D.S., supra*, 46 Cal.App.5th at p. 1052.)

Mother contends that DCFS failed to fulfill its duty of inquiry. Although DCFS asked mother and her parents for information regarding their claims of possible Native American ancestry, mother notes that there is no record that DCFS asked those individuals whether there were other family members with more information. Similarly, there is no indication in the record that DCFS inquired of other maternal relatives, including maternal aunts and cousins with whom it communicated throughout the proceedings, regarding their knowledge on the subject. Mother contends that by failing to interview all extended family members and others with an interest in the child, DCFS failed in its duty of inquiry. (§ 224.2, subd. (b); see *In re A.M.* (2020) 47 Cal.App.5th 303, 322.) Moreover, DCFS did not include complete information for maternal relatives on the ICWA notices, including dates and places of birth for maternal great-grandparents, which might have been gathered as a result of further inquiry. Omitting known identifying information for a child's ancestors violates state and federal law. (*In re Y.W., supra*, 70 Cal.App.5th at p. 557; see also *In re J.S.* (2021) 62

37

Cal.App.5th 678, 688 [ICWA notice "'must include enough information for the tribe to "conduct a meaningful review of its records to determine the child's eligibility for membership"'"].)

DCFS implicitly concedes the error, but argues that it was harmless. We need not reach the issue of harmlessness, as DCFS may correct any inquiry or notice errors upon remand. We also note that to the extent DCFS did not provide additional follow-up to the outstanding notices, as ordered by the court in advance of the section 366.26 hearing, it must do so.

## DISPOSITION

The order denying mother's section 388 petition is affirmed. The order terminating mother's parental rights is reversed. The matter is remanded for the juvenile court to conduct a new section 366.26 hearing in conformity with the principles articulated in *Caden C., supra*, 11 Cal.5th 614, and taking into consideration the family's current circumstances and any developments in the dependency proceedings that may have arisen during the pendency of the appeal. Additionally, the juvenile court is directed to order DCFS to comply with the provisions of ICWA and California law consistent with this opinion.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


COLLINS, J.

We concur:


CURREY, ACTING, P.J.

DAUM, J.*

---

\* Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.